UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

JANE DOE,
as Relator for the
UNITED STATES OF AMERICA,                    No.
STATE OF ILLINOIS and
STATE OF INDIANA

      Plaintiffs,

vs.

HOUCHENS INDUSTRIES, INC.                    **1: 13 -cv- 0 1 9 6 RLY -MJD**

      Defendant.

---

## PLAINTIFFS' COMPLAINT

---

# FILED UNDER SEAL

Ronald J. Waicukauski
**PRICE WAICUKAUSKI & RILEY, LLC**
Attorney No. 1089-53
Attorney for Plaintiff/Relator
301 Massachusetts Avenue
Indianapolis, IN 46204
(317) 633-8787
rwaicukauski@price-law.com

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2013 FEB -4  PM 4:29

SOUTHERN DISTRICT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

JANE DOE,
as Relator for the
UNITED STATES OF AMERICA,
STATE OF ILLINOIS and
STATE OF INDIANA

No. _____

**1 : 1 3 -cv- 0 1 9 6 RLY -MJD**

**FILED UNDER SEAL
PURSUANT TO THE
FEDERAL FALSE CLAIMS ACT
31 U.S.C. 3730(b)(2)**

Plaintiffs,

**JURY TRIAL DEMANDED**

vs.

**COMPLAINT**

HOUCHENS INDUSTRIES, INC.

Defendant.

---

## COMPLAINT
### INDEX

#### Page

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

III.   Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

IV.    Medicaid Best Price Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.     Medicare Part D Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.   The Prescription Drug Event Record (PDE) Constitutes a "Claim"
       for Payment as that Term is Used in the False Claims Act.........13

    B.   Medicare Part D Usual & Customary Pricing Restrictions...................17

1

VI.     History of Drug Discount Programs for Cash Customers . . . . . . . . . . . . . . . . . 19

VII.    The Program Development and Relator's Discovery of the Fraud. . . . . . . . . . . . . 19

Count I   Violations of Federal False Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Count II  Illinois Whistleblower Reward and Protection Act . . . . . . . . . . . . . . . . . . . . . 30

Count III Indiana State False Claims and Whistleblowers Protection Act . . . . . . . . . . 31

Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Jury Demand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.   **INTRODUCTION**

1.      This is a False Claims Act case brought under the Federal False Claims Act, 31 U.S.C. §3729, et seq. and the false claims acts of the plaintiff states. It is brought by plaintiff and Relator, Jane Doe through her undersigned attorneys, on behalf of the United States of America (or the federal Government), the states of Illinois and Indiana (collectively "the states.")

2.      This case involves illegal overbilling by Defendant Houchens Industries, Inc. (hereinafter "Defendant") to the federal government and states in Medicare Part D, and Medicaid (hereinafter collectively "government programs") programs. Beginning sometime in 2008 and continuing, Defendant began a successful marketing campaign to lure customers without prescription insurance, offering them deep discounts for a large variety of generic drugs. These inexpensive, discounted prices established the "Usual and Customary" prices for these generic prescription drugs. Federal health care laws for government program and billing laws and regulations of the plaintiff state governments mandated that the governments were not to be charged more than the "Usual and Customary" prices for these drugs. Despite these laws, Defendant knowingly charged the plaintiff governments substantially more for these generic prescription drugs in the government programs, thereby wrongfully overcharging the plaintiff governments in violation of the false claims acts.

II.   **JURISDICTION AND VENUE**

3.      This is a civil action arising under the laws of the United States to redress violations of the False Claims Act, 31 U.S.C. §§3729 et seq. This court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. §3732, which specifically

confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730; and (ii) pursuant to 28 U.S.C. §1331, which confers federal subject matter jurisdiction; and (iii) pursuant to 28 U.S.C. §1345, because the United States is a plaintiff.

4.     This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit or investigation, or from the news media.

5.     To the extent that there has been a public disclosure unknown to Relator, Relator is an original source under 31 U.S.C. §3730(e)(4), and the other government false claims statutes. She has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing this *qui tam* action.

6.     Relator is concurrently providing to the Attorney General of the United States, to the United States Attorney for the Southern District of Indiana, and to the appropriate attorneys for the other government plaintiffs, a statement summarizing known material evidence and information related to this Complaint, in accordance with the provisions of 31 U.S.C. §3730(b)(2) and the similar provisions of the other government false claims acts. This disclosure statement is supported by material evidence.

7.     This court has jurisdiction over Defendant under 31 U.S.C. §3732(a) because Defendant can be found in, is authorized to transact business in, and is now

4

transacting business in the Southern District of Indiana. In addition, acts proscribed by 31 U.S.C. §3729 have occurred in this District.

8.      Venue is proper in the Southern District of Indiana under 31 U.S.C. §3732(a) and 28 U.S.C. §1391, because Defendant conducts business in this District and, upon information and belief, the acts giving rise to this action occurred within the District.

9.      This Court has supplemental jurisdiction over the false claims act claims of the other plaintiff governments pursuant to 28 U.S.C. §1367. This federal court jurisdiction over state law false claims is further authorized by 31 U.S.C. §3732(b).

III.   **PARTIES**

10.     Defendant is, on information and belief, a Kentucky corporation. It claims to be the largest one hundred percent employee owned company in the United States. It is a diversified conglomerate owned by its 16,000 employees with its corporate offices in Bowling Green, Kentucky. Defendant has interests in retail grocery, pharmacies, convenience stores, quick-to-service restaurants, insurance, stock brokerage, financial services, franchising of optical stores, construction, fence materials manufacturing and distribution, crushed stone aggregates and asphalt paving, recycling, tanning supply distribution, manufacturing, software and website development, property management and juice concentrate manufacturing and distribution. On information and belief it is operating ten (10) Hometown IGA's in Indiana and one (1) in Illinois which are retail grocery stores with pharmacies. Defendant purchased "Buehler's Buy-Low" from Buehler Foods, Inc. in 2008 and its pharmacies and thereafter renamed the stores "Hometown IGA".

11.     Plaintiff and Relator Jane Doe is employed as a pharmacy technician for Defendant at its pharmacy located in Princeton, Indiana.  She is a 1990 graduate of Evansville North High School and a 1993 graduate of Vincennes University with an AS degree.  She has been a pharmacy technician for 18 years. She is licensed by the Indiana State Board of Pharmacy and nationally certified by the Pharmacy Technician Certification Board since 1996. She began her pharmacy career at H & R Pharmacy in Poseyville, Indiana under the supervision of the owner/pharmacists.  Several years later she accepted the lead technician position at Welborn Clinic Pharmacy (Princeton Indiana location). This was an HMO pharmacy that serviced only Welborn-HMO covered customers. Within a few years all of the Welborn Clinic Pharmacies were sold to CVS and a position was offered to her at the nearby CVS pharmacy.  At that time, she was approached by the owner of a local chain of independent pharmacies to come to work for one of his stores, South Gibson Pharmacy.  Relator  accepted this lead tech position and like all other technician jobs she  had in the past, the responsibilities were the same:  Customer service, inventory control/management, filing, filling prescriptions, data entry, billing, ordering, insurance issues, drug recalls etc.  Like many other independent pharmacies, this company also sold out to CVS.  Once again, she was offered a position at the nearby CVS pharmacy.  With a week's notice of the sale, she accepted the position and worked there for nine months.  In July 2004 her former boss at CVS asked her to come to work for him at Buehler's BuyLow Pharmacy owned by the Buehler family. The Buehler family filed bankruptcy a few years later and the chain of grocery stores and the pharmacies located within were acquired by Defendant. The

Buehler name remained until Defendant began renaming the stores "Hometown IGA's" approximately several years ago.

IV.     **MEDICAID BEST PRICE LAWS**

12.     When reimbursing for drugs, the federal-state Medicaid Program mandates that the Medicaid Program shall pay the lower of (1) the estimated acquisition cost (EAC) of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary (U&C) charges to the general public. 42 C.F.R.§447.331.   Federal regulations define "estimated acquisition costs" in part as "the agency's best estimate of the price generally and currently paid by providers for a drug…" 42 C.F.R.§447.301. To determine the EAC for a covered drug, state Medicaid Programs are required to develop reimbursement formulas that must be approved by the Secretary of Health and Human Services. 42 C.F.R. §§447.331, 447.332 and 447.333 (2005).

13.     While the specific reimbursement formulas vary from state to state, the state Medicaid Programs reimburse pharmacy providers for each drug based on the lowest of (a) the EAC as set by the states, (b) the Maximum Allowable Cost (MAC) set by the State Medicaid agency or (c) **the provider's usual and customary charge**. For generics (a/k/a "multiple source drugs") subject to a Federal Upper Limit (FUL), state Medicaid agencies must not pay more than those limits. 42 C.F.R §§447.331, 447.332 and 447.333(2005).

14.     Defendant, as a retail pharmacy selling drugs to Medicaid customers, has entered into Medicaid provider agreements with state Medicaid agencies in which it has agreed to comply with all Medicaid state and federal laws. Entering into these agreements and obedience thereto are conditions to payment of claims for drugs.

7

15.     Submission of claims by pharmacy providers such as Defendant to the Medicaid agencies are made electronically, in real time.  Protocols for this transmission have been created by an ad hoc standards organization called the National Council for Prescription Drug Programs, Inc. (NCPDP).  Each claim is a separate transaction. The NCPDP standard specifies the information that must be transmitted and in which fields the data must be entered.   This is accomplished by the computer software in the pharmacy as the information is entered or calculated.  When the claim is so submitted, the Medicaid agency receives the claim, and in a few seconds either accepts or rejects it.  If the claim is accepted, the Medicaid agency transmits a message back to the pharmacy that acknowledges the acceptance of the claim, assigns it a unique reference number and processes it for payment in the next cycle – usually in a few weeks. These protocols have been in place for decades, and are occasionally updated. The pharmacy's Usual and Customary price is a mandated datum. It is entered into the computer system in the pharmacy, is included in the claim submission, and is considered by the Medicaid agency's computer system in calculating the proper reimbursement.

16.     State Medicaid rules also mandate that pharmacies charge Medicaid no more than the usual and customary prices. For example, ILL. ADMIN. CODE tit. 89 §140.12 provides that a Provider agrees to "[m]ake charges for the provision of services and supplies to recipients in amounts not to exceed the provider's usual and customary charges and in the same quality and mode of delivery as are provided to the general public."

17.     Attached as Exhibit 1 is a March 24, 2011 letter of the Illinois Department of Healthcare and Family Services, which explains that this Medicaid agency "publishes reimbursement policy in its Pharmacy Provider Handbook requiring pharmacy providers to bill Medicaid services at 'usual and customary' ("U&C") charges. For further clarity, HFS defines U&C charges in the Pharmacy Handbook as "'the amount a provider would charge cash customers for a prescription, exclusive of sales tax.' Should a provider's U&C charges be less than the maximum allowable HFS rate for a drug, HFS reimburses at an amount equal to the provider's U&C charge amount."

18.     The Indiana Health Coverage Programs Provider Manual, Chapter 9: IHCP Pharmacy Services Benefit, Section 4, Pharmacy Billing Policies and Procedures, 9-26 provides as follows:

> When billing the Program for any covered service, the provider submits **only** the provider's usual and customary charge to the general public for the covered service. *This includes any special pricing that is offered to the general public, such as for $4 generic Programs.* (Emphasis added here) The usual and customary charge includes the provider's dispensing fee, if any.

## V.    MEDICARE PART D LAWS

19.     Medicare is a federally-funded health care insurance program created in 1965 by Title XVIII of the Social Security Act, and provides insurance coverage for people over the age of 65 and people with disabilities. It is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is a division of the United States Department of Health and Human Services ("HHS").

20.     Medicare Part A pays for, *inter alia,* items and services provided to hospital inpatients, home health care patients, and for patients of Skilled Nursing Facilities ("SNFs"). A SNF provides skilled care to a patient after an injury or a hospital stay if the

patient meets certain conditions, and may be part of a nursing home or hospital. 42 U.S.C. §§ 1395c, 1395d.

21.     Medicare Part B is a federal program that covers physician services and certain injectable, inhalation and infused drugs administered by the health care provider. 42 U.S.C. §§ 1395j, 1395k, 1395l.

22.     Medicare Part C, also known as Medicare Advantage ("MA"), allows Medicare Part A and B eligibles to pay premiums to a provider network and receive their covered services through that network. The government pays the provider a monthly capitated amount to provide Medicare Part A and Part B items and services to the enrolled beneficiaries.  42 U.S.C. §1395w-21 et seq.  For an additional premium, most plans also offer Medicare Part D outpatient drug coverage, and are known as MA-PD plans. Whether ultimately paid by the government directly or on a capitated basis, the government imposes certain reporting requirements to ensure that it is only paying for eligible drugs.

23.     Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled. 42 U.S.C. §1395w-101 et seq. Part D requires beneficiaries to enroll and pay certain premiums, deductibles, co-payments, and even 100% of drug costs after a certain dollar threshold and up to a maximum dollar amount (the "donut hole"), that then triggers catastrophic coverage. The federal government pays 75% of actual costs between the deductible and the donut hole, and 95% of catastrophic coverage. For low-income individuals there are various tiers in which the government pays greater percentages, up to a 100% subsidy which may be capitated.

24.     Medicare Part D adopted Medicaid's definition of "covered outpatient drugs." 42 U.S.C. §1395W-102(e) and 42 C.F.R. §423.100, *incorporating by reference* 42 U.S.C. §1396r-8(k)(2)(A)(i) (excluding coverage for drugs that are not FDA-approved under section 505 of the Federal Food, Drug, and Cosmetic Act [codified at 21 U.S.C. §355]).

25.     Unlike Medicaid, Medicare Part D is a quasi-free market model with a more complex system for determining the price paid for outpatient drugs, and a more complex system for submitting claims. Ultimately, however, it is still a per-item payment system, and the federal government still pays for each drug purchased under the program.

26.     An individual is eligible to enroll in Part D if the individual lives in the service area of a Part D plan and is entitled to Medicare benefits. Part D benefits are provided by a Part D plan sponsor, which is either a prescription drug plan (PDP), a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan (MA-PD plan), a PACE organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. §423.4.

27.     The Part D plan sponsor is required to provide qualified prescription drug coverage, which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits. 42 U.S.C. §1395w-102; 42 C.F.R. §423.104(c). The requirements for standard or alternative prescription drug coverage relating to deductibles, benefit structure, initial coverage limits, out-of-pocket expenditures, etc., are set out in the Medicare Statute and the

regulations. 42 U.S.C. §1395w-102(b), (c); 42 C.F.R. §423.104(d), (e). Plans are also permitted to provide supplemental prescription coverage, which can include reductions in cost-sharing (such as reducing the deductible or coinsurance percentage) or covering certain drugs that would qualify as a covered Part D drug if they were not among the drugs described at 42 U.S.C. §1396r-8(d)(2), (d)(3) and excluded from the definition of a Part D drug at 42 U.S.C. §1395w102 (e)(2)(A). See 42 U.S.C. §1395w-102(a)(2)(A); 42 C.F.R. §423.104(f).

28.     When a pharmacy, like Defendant, dispenses drugs to a Medicare beneficiary, it submits a claim electronically to the beneficiary's Part D plan and receives reimbursement from the plan sponsor for the portion of the drug cost not paid by the beneficiary. The Part D plan sponsor ultimately notifies CMS that a drug has been purchased and dispensed by means of a document called a Prescription Drug Event record (PDE), including the amount it has paid to the pharmacy. Part D plan sponsors subcontract with many entities to provide drugs to the Medicare Part D beneficiaries enrolled in their plans. These include subcontracts with pharmacy benefit managers (PBMs) who provide drugs through mail order operations and pharmacy chains which provide drugs on a retail level. CMS uses the information in the PDE at the end of the payment year when it reconciles its advance payments to the sponsor with the actual costs that the plan sponsor has incurred throughout the year.

29.     A Part D plan sponsor must submit a bid in the year prior to the calendar year in which Part D benefits will actually be delivered. See 42 C.F.R §423.265. The bid contains a per member per month (PMPM) cost estimate for providing Part D

benefits to an average Medicare beneficiary in a particular geographic area. From the sponsor's bids, CMS calculates nationwide and regional benchmarks which represent the average PMPM cost. If the plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of the monthly beneficiary premium.

30.    CMS provides each Part D sponsor with a direct subsidy in the form of advance monthly payments equal to the Part D plan's standardized bid, risk adjusted for health status, minus the monthly beneficiary premium, estimated reinsurance subsidies for catastrophic coverage, and estimated low-income subsidies. 42 C.F.R. §423.315, 423.329.

### A.    The Prescription Drug Event Record (PDE) Constitutes a "Claim" For Payment as that Term is Used in the False Claims Act

31.    CMS pays Part D sponsors estimated payments on a monthly basis. In turn, PDP sponsors provide CMS with documentation of their actual costs. Part D sponsors provide actual cost information by submitting the Prescription Drug Event (PDE) record for every prescription that is filled for a plan member.

32.    A PDE is an electronically created document that includes 37 fields of information about a specific drug transaction. This PDE document includes, inter alia, the costs of the prescription, the payment date, the beneficiary I.D. number, the number of medications, the dispensing status, the identity number of the retail pharmacy or other provider like Defendant, the National Drug Code (NDC)  for the medication and the compound code if the dispensed drug was compounded or mixed.

33.    In the year following the benefit year, CMS reconciles a Part D plan sponsor's actual prescription drug costs as derived from its PDE records against the

sponsor's bid. If a Part D plan sponsor's actual costs exceed the estimated costs, the plan sponsor may be able to recoup some of its losses through a risk sharing arrangement with CMS. Conversely, if a Part D sponsor's estimated costs exceed its actual costs by a specified amount, payments to the Part D plan sponsor for the year are reduced and the plan sponsor will have to pay back some of its estimated payments.   **This risk sharing arrangement between CMS and PDP plan sponsors clearly puts the government as an intended beneficiary of discounted pricing if payments are increased for failure to pass discounted pricing on to the government.**

34.     As a condition for receiving its monthly payment from CMS, a Part D plan sponsor must certify the accuracy, completeness and truthfulness of all data related to payment. Data related to payment includes enrollment information, <u>claims data</u>, bid submission data and any other data specified by CMS. 42 C.F.R. §423.505(k)(1). The Part D plan sponsor also certifies its acknowledgement "that the claims data will be used for the purpose of obtaining Federal reimbursement." 42 C.F.R. §423.505(k)(3). If the claims data has been generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, that entity, contractor or subcontractor, <u>like Defendant in this case</u>, must "similarly certify" that the claims data it has generated is accurate, complete and truthful and must acknowledge that the claims data will be used for the purposes of obtaining federal reimbursement. 42 C.F.R. §423.505(k)(3).    The term "claims data" referred to in 42 C.F.R. §452.505(k)(3) includes PDE records. CMS recognizes that the submission of "inaccurate or incomplete prescription drug event (PDE) data" constitutes Medicare Part

14

D fraud, waste, or abuse.  CMS Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse, page 56.

35.   Medicare Part D plan sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. §423.505(h)(1). CMS regulations require that all subcontracts between Medicare Part D plan sponsors and downstream entities, including pharmacies and PBMs, contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. §423.505(i)(4)(iv). It is very clear that the government expects complete compliance with all laws and contract terms relating to Medicare Part D claims.

36.   Most of the Medicare Part D PDE data elements are the same elements developed by the NCPDP, which have been used for decades by PBMs, pharmacies, and other providers when submitting Medicare Part D and Medicaid claims for prescription drugs to CMS for payment.  In its "Instructions for Submitting Prescription Drug Event Data," dated 4/27/2006, at page 11, CMS stated:  "Most data elements represent existing NCPDP fields where we employ the same definition and field values that are currently in use per the NCPDP version 5.1 drug claim standard."  NCPDP version 5.1 was approved in September of 1999.

37.   When CMS identified "Data Elements for PDE Records," it clearly stated, and all parties were on notice, that submission of PDE data is an express condition of payment: "In this section, we list the required data elements that must be submitted on PDE records for payment….. This section defines each data element and its specific potential for use for CMS's payment process."   CMS "Updated Instructions:

Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 11, Sec. 2.

38.    CMS further described the purpose of the various PDE data elements as follows:  "Much of the data, especially dollar fields, will be used primarily for payment. However, some of the other data elements such as pharmacy and prescriber identifiers will be used for validation of the claims as well as for other legislated functions such as quality monitoring, program integrity, and oversight."   CMS "Updated Instructions: Requirement for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, pages 5-6, Section 1.4.

39.    CMS provided that the reporting "requirements apply to all Part D Plans." "Updated Instructions:   Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 5. Thus, CMS data reporting requirements and instructions apply to all Medicare Part D Plans (PDPs), Medicare Advantage Part Plans (MA-PDs), and any other entity providing Medicare Part D benefits.

40.    Sponsors and their subcontractors, when submitting Medicare Part D PDE data to CMS, must certify that all claims are true and accurate.  CMS Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse, Section 80.1, p. 67, citing 42 C.F.R. §423.505(k)(3).

41.    Thus, CMS's regulations for the submission of Medicare Part D PDE data place the legal risk of submitting invalid Medicare Part D claims data squarely with the submitting or generating entity: "CMS requires that **any entity that generates [Part D] claims data** on behalf of a Sponsor" must both: **"certify to CMS the accuracy, completeness, and truthfulness of that data;"** and "acknowledge that the data will

be used for purposes of obtaining Federal reimbursement." <u>See</u> "Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse," page 16, Section 40-2; citing 42 C.F.R. §423.505(k)(3) (emphasis added).

42.     In keeping with the requirements of 42 C.F.R. §423.404(k)(3) and CMS Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse, Section 80.1, p. 67, Sponsors and their subcontractors who submit Medicare Part D PDE data to CMS must certify that it is true and accurate. Since January 2006, this express certification of Medicare Part D PDE data has been included in CMS's Electronic Data Interchange (EDI) Agreement (or a similar document). The EDI Agreement must be executed in order for an eligible organization to submit PDE data electronically to CMS.  The EDI is executed by Medicare Plans offering Part D prescription drug benefit and/or the Part D PMBs who submit PDE data on behalf of Part D Sponsors.  The certification on the Part D EDI Agreement contains the following (or similar) language:

> **"By signing below, the eligible organization certifies that each submission of PDE data pursuant to this Agreement will be accurate and complete to the eligible organization's best knowledge, information and belief."**

**B.     Medicare Part D Usual & Customary Pricing Restrictions**

43.     Medicare Part D prescriptions claims are subject to the similar type of Usual & Customary (U&C) pricing laws and rules as are Medicaid prescriptions.  If a provider's usual price is lower than the Medicare contract price the provider must provide that lower price to Medicare or risk being excluded as a provider.  42 U.S.C. 1320a-7(b)(6) provides that the Secretary may exclude entities from participation in any Federal health care for submitting claims for excessive charges.  This section provides as follows:

17

Any individual or entity that the Secretary determines-

(A) has submitted or caused to be submitted bills or requests for payment (where such bills or requests are based on charges or cost) under subchapter XVIII of this chapter or a State health care program containing charges (or, in applicable cases, requests for payment of costs) for items or services furnished *substantially in excess of such individual's or entity's usual charges…. (emphasis added).*

44. Medicare Part D prescriptions are also subject to U&C private contract pricing terms and conditions imposed by the PDP sponsors and the PBM companies that adjudicate and administer Medicare Part D Plans. These private contract pricing terms accrue to the benefit of Medicare Part D by providing lower discounted U&C pricing to Medicare. PBM companies have large networks of contracted pharmacies, both retail and mail-order, to provide claims service to private and Medicare Part D patients.

45.    One of the important terms of any PBM contract is a requirement that the pharmacy providing prescription service must price prescriptions at the PBM contracted rate or their U&C price, <u>whichever is lower</u>. See Exhibits 12 and 13 (Representative PBM Contracts). If the pharmacy is willing to sell a prescription at their lower U&C price to their usual cash customers it must also be willing to give that same lower price to Medicare Part D recipients and ultimately the government that pays for them. It is very clear that the government expects complete compliance with all laws and contract terms relating to Medicare Part D claims. Defendant, Houchens Industries, Inc., is a large corporation with vast resources to enforce compliance with Medicare Part D laws, rules and contract terms.

VI.   **HISTORY OF DRUG DISCOUNT PROGRAMS FOR CASH CUSTOMERS**

46.    In 2006, Wal-Mart began a discount Program for cash customers who purchased prescription generic drugs. They priced these drugs at a flat $4.00 for thirty doses, and $9.00 for ninety doses. This became Wal-Mart's usual and customary (U & C) price for those medicines. Wal-Mart correctly established its billing system so that these discounted prices were transmitted as the U&C charge to Medicaid, Medicare and other government benefits Programs. Defendant saw the popularity of Wal-Mart's Program for cash customers, and reacted to meet the competition, shortly after it acquired Buehler Foods, Inc. in 2008, with its own cash customer discount Program for generics, marketing it as the "IGA Hometown Pharmacy Rewards Program (hereinafter "Program"). See Ex. 1 attached hereto for a description of the program.   Unlike Wal-Mart, Defendant knowingly crafted its generic prescriptions cash discount Program to deprive the federal and state governments' of the discounted prices.

VII.   **THE PROGRAM DEVELOPMENT AND RELATOR'S DISCOVERY OF THE FRAUD**

47.    The Program was unveiled in mid 2008 to the pharmacy staff at a mandatory meeting Relator attended led by Hometown IGA director Glen Millikan RPh and assistant director Leslie Bidwell.  The Program was initially called "500 for $5".  The Program listed 500 prescription drugs at commonly prescribed dosages for $5.00. Relator and others were given enrollment forms for customers to fill out and were told to sign up as many people as possible and to get the word out about the Program.  Relator was instructed to collect a small fee from the enrollees and to give them a gift card in the same amount to offset the fee they were collecting.  This way the customer would

19

not be out of pocket to enroll in the Program.  Relator was told to focus on signing people up with virtually no effort toward collecting the enrollment fee.  Relator was not provided any instructions as to how to enter the enrollment fee in the computer. Under this plan, the claims went through an online discount plan called Medical Security Card (MSC) and claims were adjudicated online to this Pharmacy Benefit Manager (PBM). Each time a claim was submitted to MSC, MSC charged Defendant $1.00.

48.     Eventually the Program went to 400 drugs for $3.99 for 30 days, $6.99 for 60 days and $9.99 for 90 days supply and eliminated using MSC. See Ex. 2. It was then the responsibility of the Relator and the other pharmacy staff to make sure that the customer paid no more than the Program price for these 400 drugs on the list. Defendant uses the QS1 NRX computer program for its pharmacy billings.  There were price plans set up in Defendant's QS1 computer software for every drug that they dispensed. This computerized billing system can be established so that the pharmacists or technicians can or cannot modify the amounts that the government programs are billed. Defendant's Program thus established the U&C price for all of the generic drugs on the Program's drug list.

49.     However, Relator and other staff were cleverly instructed by Glen Millikan and Leslie Bidwell that when billing Medicare Part D, Medicaid, Tricare or other third party for a drug on the Program list, *she was not to change the price plan* to the discounted Program price unless the customer's co-pay exceeded $3.99.  **This fraud results in the Defendant obtaining government reimbursement in excess of the U&C price for that drug.**

20

50.     Relator reports directly to her Pharmacist in Charge (PIC) and she has had three PICs during her employment with Defendant. These PIC'S are her first, Mike Kermode, RPh, Stan Fowler RPh and Todd Bryant RPh. Relator has brought up the fraudulent billing with each of them and has received this type of response: "Well, that is what we're supposed to do". The fraudulent billings to government programs have continued to the present.

51.     While Defendant initially obfuscated this Program with, among other things, a nominal annual enrollment fee, this small fee was in practice not collected. There were no instructions or protocol for collecting a fee. Eventually, the "fee" went away in its entirety. Defendant had contests for which store would sign up the most people. As an additional benefit, if the Program member is a diabetes customer he or she can receive an Accu Chek blood glucose meter at no cost with a first diabetes prescription purchase.

52.     Government program agencies are generally unaware of this fraudulent overbilling scheme related to the U&C price on generic drugs. Their computerized billing systems and oversight Programs are not designed to ferret out this U&C discrepancy fraud.

53.     The current state Medicaid agencies also are simply not likely to have the resources to commit to properly investigate violations of the legal requirement that providers only charge Medicaid their usual and customary charge. Exhibit 1 is a March 24, 2011 letter from the Illinois Department of Healthcare and Family Services, where that Medicaid enforcement agency explains:

> "In terms of post-payment enforcement of this reimbursement policy, HFS does not actively audit pharmacies for compliance. Illinois currently has

> more than 2,900 retail pharmacies participating in the Medicaid Program
> and HFS reimburses pharmacies for more than 22 million prescription
> drugs annually. Due to our large claims volume, it is neither reasonable
> nor practicable for HFS to do post-payment price comparisons between
> cash customer rates and HFS charged amounts."

In this same letter, the Illinois Medicaid agency clarifies that pharmacies are only to bill Medicaid their usual and customary charge, as mandated by its Pharmacy Provider Handbook. Indiana Medicaid and Medicare Part D are similarly limited in their capacity to do post-payment price comparisons between cash customer rates and benefits payable under each respective benefit program.

54.    In her job as a pharmacy technician at a Defendant pharmacy in Indiana, Relator has seen numerous examples of the Medicaid and Medicare Part D programs being wrongfully overcharged for generic prescription drugs among the 400 generic medications on which Defendant offers the Program. Relator is the Medicaid administrator for the pharmacy and is the only personnel in the store with the password to the Medicaid website where she can verify Medicaid payments for each prescription. With respect to Medicare Part D, the computer provides a printout of the amount reimbursed as co-pay and government reimbursement for each prescription.

55.    Relator has observed that other pharmacists and technicians of Defendant are not aware of Medicaid being overbilled. These pharmacists and technicians are also powerless to rectify the situation by providing beneficiaries of Medicaid with the lower Program discounted prices for the generic drugs. Defendant has set up its computerized billing system so that the pharmacists and technicians at the retail level can do nothing about this overbilling, even if they are aware of it. On information and belief,

Defendant's Illinois pharmacy is engaged in the same fraud utilizing the same computerized billing system.

56.     Exhibit 3 is a March, 2012 list of the generic prescriptions offered on the Program. The customer and anyone in the household can pay only $3.99 for a 30 day supply and $9.99 for a 90 day supply of over 400 generic and brand name prescriptions

57.     Exhibit 4 was obtained by Relator from Defendant's computer billing records.  This exhibit shows at top left and top center a duplicate of the bottle labels that were affixed to the customer's prescription bottle.  This label shows that Customer A received prescription 6047847, a prescription for 30 Miloxicam 7.5mg tablets on June 9, 2011.  The top right side and the bottom 2/3 of the exhibit are duplicates of the records retained by Defendant relating to this prescription. The exhibit shows that the third party payer in this case was Community Care Penn which is a Medicare Part D plan. This medication, strength and quantity are on the $3.99 list at Defendant's pharmacies. In this case, the co-pay was $2.00 as shown on the left middle of the exhibit.  On the top right of the exhibit, "Price" 9.96 represents the total amount paid to Defendant including the co-pay for this prescription.  In this case, Medicare Part D paid $7.76.  The following is a summary of the fraud:

| | | | |
|---|---|---|---|
| RX Number | 6047847 | Date | 6/9/2011 |
| Drug Name | Miloxicam 7.5mg Tablets | Qty | #30 |
| Plan Name | Community Care Penn | | |
| Government Plan Type | Medicare Part D | | |
| Amount Government Paid | $7.76 | | |
| Amount Patient Paid (Co-pay) | $2.00 | | |
| Total Paid by Gov & Patient | $9.76 | | |
| U&C Price | $3.99 | On List | YES |
| **Overcharge** | **$5.77** | | |

23

58.     Exhibit 5 was obtained by Relator from Defendant's billing records and from the Indiana Medicaid website. The first page is an Explanation of Benefits (EOB) from Indiana Medicaid and the second page is a Defendant billing record with the same computer form fields as Exhibit 4.   This label shows that Customer B received prescription 6041314, a prescription for 30 Cetirizine HCL 10mg tablets on June 6, 2011. The exhibit shows that the third party payer in this case was Hoosier RX which is how Indiana Medicaid is identified in the computer program. This medication, strength and quantity are on the $3.99 list at Defendant's pharmacies.  Both pages show the customer paid no co-pay (co-pay is sometimes waived by Medicaid) and Medicaid paid $7.50.  The following is a summary of the fraud:

| | | | |
|---|---|---|---|
| RX Number | 6041314 | Date | 6/6/2011 |
| Drug Name | Cetirizine HCL 10mg Tablets | Qty | #30 |
| Plan Name | Hoosier RX | | |
| Government Plan Type | Medicaid | | |
| Amount Government Paid | $7.50 | | |
| Amount Patient Paid (Co-pay) | $0.00 | | |
| Total Paid by Gov & Patient | $7.50 | | |
| U&C Price | $3.99 | On List | YES |
| **Overcharge** | **$3.51** | | |

59.     Exhibit 6 was obtained by Relator from Defendant's billing records and from the Indiana Medicaid website. The first page is an Explanation of Benefits (EOB) from Indiana Medicaid and the second page is a Defendant billing record with the same computer form fields as Exhibit 4.   This label shows that Customer D received prescription 6048345, a prescription for 30 Sertraline HCL 100 mg tablets on June 6, 2011. The exhibit shows that the third party payer in this case was Hoosier RX.  This medication, strength and quantity are on the $3.99 list at Defendant's pharmacies.  Both

pages show the customer paid no co-pay and Medicaid paid $7.25. The following is a summary of the fraud:

| RX Number | 6048345 | Date | 6/6/2011 |
|---|---|---|---|
| Drug Name | Sertraline HCL 100mg Tablets | Qty | #30 |
| Plan Name | Hoosier RX | | |
| Government Plan Type | Medicaid | | |
| Amount Government Paid | $7.25 | | |
| Amount Patient Paid (Co-pay) | $0.00 | | |
| Total Paid by Gov & Patient | $7.25 | | |
| U&C Price | $3.99 | On List | YES |
| **Overcharge** | **$3.26** | | |

60.    Exhibit 7 was obtained by Relator from Defendant's billing records. The exhibit is a Defendant billing record with the same computer form fields as Exhibit 4. This label shows that Customer E received prescription 6047007, a prescription for 30 Levothyroxine 50 mg tablets on July 6, 2011. The exhibit shows that the third party payer in this case was Humana Medicare Part D. This medication, strength and quantity are on the $3.99 list at Defendant's pharmacies. The customer paid no co-pay and Medicare Part D paid $5.00. The following is a summary of the fraud:

| RX Number | 6047007 | Date | 7/6/2011 |
|---|---|---|---|
| Drug Name | Levothyroxine 50 mg Tablets | Qty | #30 |
| Plan Name | Humana Medicare Part D | | |
| Government Plan Type | Medicare | | |
| Amount Government Paid | $5.00 | | |
| Amount Patient Paid (Co-pay) | $0.00 | | |
| Total Paid by Gov & Patient | $5.00 | | |
| U&C Price | $3.99 | On List | YES |
| **Overcharge** | **$1.01** | | |

61.    Exhibit 8 was obtained by Relator from Defendant's billing records. The exhibit is a Defendant billing record with the same computer form fields as Exhibit 4. This label shows that Customer F received prescription 6047117, a prescription for 30

Simvastatin 40 mg tablets on June 9, 2011. The exhibit shows that the third party payer in this case was Humana Medicare Part D.  This medication, strength and quantity are on the $3.99 list at Defendant's pharmacies.  The customer paid a $6.00 co-pay and Medicare Part D paid $9.32. In this case, Customer F's transaction should have been reversed and never billed to the Medicare Part D plan as Defendant staff was instructed to never let the customer pay more than they would if they had paid cash.  This claim was missed by staff and the customer paid more than he or she should have under the instructions to staff from Defendant. The following is a summary of the fraud:

| | | | |
|---|---|---|---|
| RX Number | 6047117 | Date | 6/9/2011 |
| Drug Name | Simvastatin 40 mg Tablets | Qty | #30 |
| Plan Name | Humana Medicare Part D | | |
| Government Plan Type | Medicare | | |
| Amount Government Paid | $9.32 | | |
| Amount Patient Paid (Co-pay) | $6.00 | | |
| Total Paid by Gov & Patient | $15.32 | | |
| U&C Price | $3.99 | On List | YES |
| **Overcharge** | **$11.33** | | |

62.     Exhibit 9 was obtained by Relator from Defendant's billing records and from the Indiana Medicaid website. The first page is an Explanation of Benefits (EOB) from Indiana Medicaid and the second page is a Defendant billing record with the same computer form fields asExhibit 4.   This label shows that Customer H received prescription 6048448, a prescription for 30 Hydrochlorothiazide 25 mg tablets on June 7, 2011. The exhibit shows that the third party payer in this case was Hoosier RX. This medication, strength and quantity are on the $3.99 list at Defendant's pharmacies. Both pages show the customer paid a $3.00 co-pay and Medicaid paid $5.28. The following is a summary of the fraud:

| | | | |
|---|---|---|---|
| RX Number | 6048448 | Date | 6/7/2011 |

26

| | | | |
|---|---|---|---|
| Drug Name | Hydrochlorothiazide 25 Mg | Qty | #30 |
| Plan Name | Hoosier RX | | |
| Government Plan Type | Medicaid | | |
| Amount Government Paid | $5.28 | | |
| Amount Patient Paid (Co-pay) | $3.00 | | |
| Total Paid by Gov & Patient | $8.28 | | |
| U&C Price | $3.99 | On List | YES |
| **Overcharge** | **$4.29** | | |

63.    Exhibit 10 was obtained by Relator from Defendant's billing records and
from the Indiana Medicaid website. The first page is an Explanation of Benefits (EOB)
from Indiana Medicaid and the second page is a Defendant billing record with the same
computer form fields as Exhibit 4.   This label shows that Customer I received
prescription 6044692, a prescription for 30 Levothyroxine 75 mg tablets on June 2,
2011. The exhibit shows that the third party payer in this case was Hoosier RX.  This
medication, strength and quantity are on the $3.99 list at Defendant's pharmacies. Both
pages show the customer paid a $3.00 co-pay and Medicaid paid $5.48. The following
is a summary of the fraud:

| | | | |
|---|---|---|---|
| RX Number | 6044692 | Date | 6/2/2011 |
| Drug Name | Levothyroxine 75 mg Tablet | Qty | #30 |
| Plan Name | Hoosier RX | | |
| Government Plan Type | Medicaid | | |
| Amount Government Paid | $5.48 | | |
| Amount Patient Paid (Co-pay) | $3.00 | | |
| Total Paid by Gov & Patient | $8.48 | | |
| U&C Price | $3.99 | On List | YES |
| **Overcharge** | **$4.49** | | |

64.    Exhibit 11 was obtained by Relator from Defendant's billing records. The
exhibit is a Defendant billing record with the same computer form fields as Exhibit 4.
This label shows that Customer J received prescription 6040238, a prescription for 30
Simvastatin 40 mg tablets on June 13, 2011. The exhibit shows that the third party

27

payer in this case was Caremark Medicare Part D.  This medication, strength and quantity are on the $3.99 list at Defendant's pharmacies. The customer paid no co-pay and Caremark Medicare Part D paid $7.79.

| | | Date | 6/13/2011 |
|---|---|---|---|
| RX Number | | | |
| Drug Name | Simvastatin 40 mg Tablets | Qty | #30 |
| Plan Name | Caremark Medicare | | |
| Government Plan Type | Medicare | | |
| Amount Government Paid | $7.79 | | |
| Amount Patient Paid (Co-pay) | $0.00 | | |
| Total Paid by Gov & Patient | $7.79 | | |
| U&C Price | $3.99 | On List | YES |
| **Overcharge** | **$3.80** | | |

## COUNT I

### Violations of False Claims Act
### 31 U.S.C. §3729 et seq.
### On Medicaid Program

65.     Relator-Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

66.     This Count is brought by Relator-Plaintiff in the name of the United States against Defendant under the *qui tam* provisions of 31 U.S.C. §3729 et seq. Defendant violated 31 U.S.C. §3729(a)(l)(A) by knowingly presenting false Medicaid claims to the United States, in respect to the portions of Medicaid program as described above. Defendant also violated 31 U.S.C. §3729(a)(1)(B) by knowingly making, using or causing to be made or used, false records or statements material to a false or fraudulent claim under the Medicaid program, as described above.

67.     The false or fraudulent claims and statements were and are material to the United States paying for the Medicaid claims described above, and the amounts of the claims were and are material as well.

28

68.    As a result, plaintiff United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT II

### Violations of False Claims Act
### 31 U.S.C. §3729 et seq.
### On Medicare Part D Program

69.    Relator incorporates by reference and re-alleges all the above paragraphs as if fully set forth herein.

70.    This Count is brought by Relator in the name of the United States against Defendant under the *qui tam* provisions of 31 U.S.C. §3729 et seq. Defendant violated 31 U.S.C. §3729(a)(l)(A) by knowingly presenting false claims to the United States under the Medicare Part D program, as described above. Defendant also violated 31 U.S.C. §3729(a)(l)(B) by knowingly making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, under the Medicare Part D program, as described above.

71.    The false or fraudulent claims and statements to obtain payments under the Medicare Part D program were and are material to the United States paying pharmacy claims submitted by Defendant under that program.

## COUNT III

### Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175/1 *et seq.*

72.    Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

73.     This is a claim against Defendant for treble damages and penalties on behalf of the State of Illinois under the Illinois Whistleblower Reward and Protection Act, violation of 740 ILCS 175/1 *et seq.*

74.     By virtue of the above-described acts, among others, Defendant did knowingly and willfully overcharge the Illinois Medicaid Program for generic prescription drugs, in violation of 740 ILCS 175/1 *et seq.*  Defendant knowingly caused false claims to be presented to the Illinois Medicaid Program.  Defendant also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim to the Illinois Medicaid Program.

75.     The false or fraudulent claims and statements were and are material to Illinois paying for the Medicaid claims described above, and the amounts of the claims were and are material as well.

76.     By reason of Defendant's unlawful acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT IV

### Indiana State False Claims and Whistleblowers Protection Act, IND. CODE ANN. § 5-11-5.5-1 — 5-11-5.5-18

77.     Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

78.     This is a claim against Defendant for treble damages and penalties on behalf of the State of Indiana under the Indiana State False Claims and Whistleblowers Protection Act, Ind. Code Ann. §5-11-5.5-1 - 5.11-5.5-18.

79.     By virtue of the above-described unlawful acts, and in violation of IND. Code Ann. §5-11-5.5-2 Sec. 2(b)(1) and (2), Defendant knowingly caused false claims to be presented to the Indiana Medicaid program. Defendant also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim being submitted to the Indiana Medicaid program.

80.     The false or fraudulent claims and statements were and are material to Indiana paying for the Medicaid claims described above, and the amounts of the claims were and are material as well.

81.     By reason of Defendant's unlawful acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**PRAYER FOR RELIEF**

82.     Pursuant to the Federal False Claims Act, the United States and Relator request treble damages, a penalty of $5,500 to $11,000 per claim, and all attorneys' fees and costs allowed under the Act for the United States and the Relator, against Defendant.

83.     Pursuant to the false claim acts of the states, the said political entities and Relator request treble damages, all per-claim penalties, and attorneys' fees and costs for plaintiffs and Relator, against Defendant.

84.     Relator requests an appropriate share of the recoveries for the United States and all of the plaintiff states pursuant to their respective false claims acts.

## JURY DEMAND

Plaintiffs demand trial by jury on all claims

**PRICE WAICUKAUSKI & RILEY, LLC**

By _Ronald J. Waicukauski_

Ronald J. Waicukauski
Attorney No. 1089-53
Attorney for Plaintiff/Relator
301 Massachusetts Avenue
Indianapolis, IN 46204
(317) 633-8787
rwaicukauski@price-law.com

**WOJTALEWICZ LAW FIRM, LTD.**

Brian Wojtalewicz
MN Lic. #118369
139 N. Miles, P.O. Box 123
Appleton, MN 56208-0123
(320) 289-2363
brian@wojtalewiczlawfirm.com

**NEIL P. THOMPSON, RPH, ESQ.**

Neil P. Thompson
MN Lic. #0291638
2249 East 38th Street
Minneapolis, MN 55407-3083
(612) 246-4788
nptrxlaw@gmail.com

**ROBERT P. CHRISTENSEN, P.A.**

Robert P. Christensen
MN Lic. #16597
5775 Wayzata Boulevard, Suite 670
Minneapolis, MN 55416
(612) 333-7733
bob@mnadvocatesforjustice.com

**LEVANDER & VANDER LINDEN, P.A.**

James G. Vander Linden
MN Lic. #112136
5775 Wayzata Boulevard, Suite 670
St. Louis Park, MN 55416
(612) 339-6841
jim@vanderlindenlaw.com